### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### AT ELKINS

**TRIPLE R RANCH, LLC, and
ERIC HEDRICK**
HC 32 Box 63 E
Upper Tract, WV 26866

5353 South Mill Creek Road,
Upper Tract, WV 26866

**Plaintiffs,**

**vs.**

**PILGRIM'S PRIDE CORPORATION**
Serve:  Corporation Service Company
209 West Washington Street
Charleston, WV 25302

**Defendant.**

> ELECTRONICALLY
> FILED
> Oct 25, 2018
> U.S. DISTRICT COURT
> Northern District of WV

CIVIL ACTION NO. 2:18-cv-109  (Bailey)

---

### COMPLAINT

COMES NOW, the Plaintiffs, Triple R Ranch, LLC, and Eric Hedrick, and file this Complaint against the Defendant, Pilgrim's Pride Corporation for violations of the federal Agricultural Fair Practices Act of 1967, the Packers and Stockyards Act of 1921, as well as breach of contract, breach of the covenant of good faith and fair dealing, fraud and negligent, willful and reckless misrepresentation.

### NATURE OF CASE

Plaintiffs claim damages against the Defendant for violation of the Agricultural Fair Practices Act (hereinafter "AFPA"), violation of the Packers and Stockyards Act (hereinafter "PSA"), fraud, breach of contract, breach of the covenant of good faith and fair dealing and

negligent, and willful and reckless misrepresentation.  Plaintiffs seek compensatory damages, punitive damages and attorney's fees and costs.

## PARTIES

1.      The Plaintiff, TRIPLE R RANCH LLC, ("TRIPLE R"), is a West Virginia Limited Liability Company with its principal place of business in Pendleton County, West Virginia.  Triple R Ranch LLC, is owned by Eric K Hedrick and his wife Rachel A Hedrick.  Eric K. Hedrick and his wife Rachel A. Hedrick purchased a farm with 13 Broiler houses for 1.45 million dollars and started providing Broiler Grow-Out Services for Pilgrim's Pride Corporation ("PPC") in January 2007.  This was the largest individually owned broiler farm in West Virginia.  The Broiler Production Agreement executed by the parties allowed the Plaintiffs up to three (3) years to complete upgrades to certain broiler houses. Surprisingly, during the grow-out of its second flock PPC's service technician informed Plaintiffs that Triple R would be required to upgrade the heating systems in some of its broiler houses or PPC would not deliver chicks to these houses.  Ultimately, all of the upgrades required by PPC cost the Plaintiffs approximately $800,000, thereby adding more requirements for debt service.  Triple R worked diligently and upgraded the houses without missing a flock during the upgrade period. Notwithstanding the required upgrades, Triple R's compensation was not affected positively. Triple R ceased providing grow-out services in November 2016.  After nine years of raising broilers for PPC, Triple R was left over two million dollars in debt.

2.      Eric Hedrick (Hedrick) is a resident of Pendleton County, West Virginia and an active member of the Contract Poultry Growers Association of the Virginias and serves on its Board of Directors.  He resides at 5353 South Mill Creek Road, Upper Tract, West Virginia 26866.

2

3.      The Defendant, Pilgrim's Pride Corporation ("PPC"), is a Delaware corporation headquartered in Greeley, Colorado, authorized to and doing business in West Virginia.  After filing bankruptcy in 2008, PPC is now a division of JBS USA, also headquartered in Greeley, Colorado, which currently ranks as the second largest live poultry dealer in the United States. JBS USA is itself an indirect, wholly-owned subsidiary of JBS, S.A. which is headquartered in Brazil and is the largest animal protein processor in the world.

## JURISDICTION AND VENUE

4.      The Plaintiffs' federal claims arise under the Agricultural Fair Practices Act, 7 U.S.C. § 2301, et seq., and under the Packers and Stockyards Act, 7 U.S.C. § 181, et seq. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331 and 7 U.S.C. §§ 209 and 2301.  This Court also has diversity jurisdiction under 28 U.S.C. § 1332 as there is complete diversity between the Plaintiffs and Defendant and the matter in controversy exceeds $75,000.

5.      This Court has supplemental jurisdiction over pendent claims arising under West Virginia law pursuant to 28 U.S.C. § 1367.

6.      This District is the proper venue under 28 U.S.C. § 1391 and L.R. Gen. P. 77.02 as Plaintiff Triple R is a West Virginia Limited Liability Company domiciled in Pendleton County, Plaintiff Eric Hedrick is a resident of Pendleton County, and many, if not all, of the acts alleged herein took place in Pendleton County and Hardy County, West Virginia within this District.

## FACTS
### PPC's Total Domination of Poultry Growers including Plaintiffs

7.      PPC is the second (2nd) largest poultry dealer in the United States, slaughtering and shipping for consumption, millions of pounds of chicken each week.

3

8.      PPC operates as what is known as an "integrator." It controls each and every aspect of raising chickens, slaughtering them, and selling their meat.  PPC's various chicken meat products come from broilers—chickens genetically altered to produce so much breast meat that their bones often cannot properly support their body—that are born in PPC's hatcheries, from eggs laid by PPC's hens, and which remain PPC's property throughout their entire lives. The broilers are grown on feed formulated and provided by PPC, in conditions regulated by PPC. Each bird is allotted less than one square foot of space in the broiler houses.  Additionally, the broilers are treated by veterinarians hired by PPC, according to PPC's standards and rules.  They are slaughtered on the date PPC selects, in PPC's plants, and where PPC employees evaluate the birds to determine whether they are fit for human consumption.  If so, they are sold based on PPC's pre-existing contracts with various purchasers.

9.      In this system, so-called farmers/independent contractors like the Plaintiffs Eric Hedrick and Triple R are known as "growers."  They grow the broilers based upon contract terms dictated by PPC. Growers, including Plaintiffs, cannot negotiate the terms of these contracts.  Thus, these contracts are contracts of adhesion.

10.      Under these dictated contracts, the growers bear virtually all the risk.  They are responsible for building and maintaining the facilities on their farms in which the broilers are cared for, relying on PPC's representations regarding its commitment to its growers and their future earnings.  They are required by PPC to take out massive loans, in some instances using documentation prepared by PPC for the loan applications.  Typically, these loans are guaranteed by the United States taxpayer, for which they are personally responsible.  In return, Plaintiffs are paid based on a "tournament system," in which all growers whose chickens are slaughtered within a given time period compete with one another.

11.     PPC disguises its virtual control of the outcome of the tournament through calculating the ranking of each grower to the ten-thousandth of a percent by averaging the so-called efficiency of a grower's production in the tournament instead of providing the growers with the outcome of each house even though PPC has this information available.  The top producing growers—as solely determined by PPC—are paid a premium over and above a so-called "base price," and the lower ranked growers are subjected to offsetting discounts or deductions below the "base price."  This is virtually a "rob Peter to pay Paul" scenario.

12.     This tournament system ensures that PPC's costs are consistent, but the growers can neither predict nor control their pay.  Indeed, PPC so dominates the growers that the growers are in effect "maintenance workers" or "sharecroppers" for PPC.

13.     PPC controls all of the aspects of genetics, nutrition, health and virtually all aspects of the environment in the grow-out process.  In all probability, the growers may influence two percent 2% of these aspects in the grow-out process.  PPC literally controls its broiler production process from the egg to the plate.  Through the contracts of adhesion that it imposes on growers, PPC controls the following aspects of the grow-out process, all of which directly impact the weight of the chickens at the end of the grow-out process, and thereby the amount of remuneration the grower receives from PPC.

    a.    PPC unilaterally controls the drafting, language and terms of the poultry growing agreement.

    b.    PPC controls the type and condition of the houses required on a grower's farm.

    c.    PPC controls the type and condition of the equipment required on a grower's farm.

    d.    PPC controls whether or not upgrades (improvements) are required on a grower's farm.

    e.    PPC controls the condition of the grower's farm adjacent to the poultry houses.

    f.    PPC controls the required maintenance of the land around the poultry houses.

    g.    PPC controls the type and kind of animals allowed on a grower's farm.

    h.    PPC controls the type of pest control allowed on a grower's farm.

    i.    PPC controls the genetics of the birds and the sex of birds delivered to growers' farms.

    j.    PPC owns and/or controls the pullets that are used to produce laying hens.

k.  PPC owns the laying hens that produce the broiler eggs hatched by the laying hens.
l.  PPC owns the eggs that are hatched by the laying hens.
m.  PPC owns and controls the hatchery where the eggs are hatched.
n.  PPC owns the broiler chicks that are hatched.
o.  PPC controls the medication for the eggs and birds and the administration of the medication.
p.  PPC controls the type of birds that each grower is given.
q.  PPC controls the health and condition of the birds delivered to a grower.
r.  PPC formulates and owns the feed provided to growers and its nutritional value.
s.  PPC controls the additives included in the feed.
t.  PPC controls the type of feed delivered to a particular grower and timing of changes to the feed ration for that grower's chickens.
u.  PPC controls if a grower gets reclaimed (old) feed.
v.  PPC determines when the birds will be delivered to a grower.
w.  PPC controls whether a grower receives veterinary services.
x.  PPC controls when veterinary services are provided on the grower's farm.
y.  PPC controls when and which birds must be killed (culled) by a grower.
z.  PPC controls the service technician that oversees each grower's farm.
aa.  PPC controls the environment the birds are grown in.
bb.  PPC controls the temperature of the poultry houses the birds are grown in.
cc.  PPC controls the airflow of the poultry houses the birds are grown in.
dd.  PPC controls the lighting of the poultry houses the birds are grown in.
ee.  PPC controls when the birds will be picked up for processing.
ff.  PPC controls the "catch crew" which picks up the birds for processing.
gg.  PPC controls the transporting of the birds to the processing plant.
hh.  PPC controls the weighing of the birds.
ii.  PPC controls the amount of time between catching the birds and weighing the birds.
jj.  PPC controls the amount of time between weighing the birds and processing the birds.
kk.  PPC even controls the disposal of the excrement of its birds.
ll.  PPC controls the condition and environment of the farm and poultry houses before new flocks will be delivered to the grower's farm.
mm.  PPC controls how long growers are held out between flocks.
nn.  PPC controls how many flocks a grower receives.
oo.  PPC controls the tournament system and income of the growers.
pp.  PPC controls recording of factors (weight, etc.) that determine a grower's income, without a grower having proper means of verifying the numbers alleged by PPC.
qq.  PPC controls whether a grower's flock is excluded from the tournament thereby affecting all growers' pay.
rr.  PPC controls whether a grower's flock gets an exception thereby affecting all growers' pay.
ss.  PPC controls which growers are ranked against each other.

14.     Under this one-sided arrangement, the growers are subject to the strict and unrelenting control of every detail by PPC.  The only thing a grower can truly call his/her own is the extensive debt that is accumulated as a direct result of meeting PPC' strict demands.

15.     PPC (along with its parent companies) are one of five giant poultry integrators worldwide.  The others are Tyson, Perdue, Sanderson and Koch. On information and belief, all five integrators use the tournament system to pay growers they have placed under contract, and all five dictate the terms of their contracts of adhesion with growers.  Thus, if a grower wishes to grow poultry for one of these five large purchasers (Integrators), there is no escape for the grower from the integrators' contracts of adhesion and the tournament system, which is designed, as noted above, to place all of the risk of financial failure on the growers.

16.     As all local growers working for PPC are required to do, Triple R, through Plaintiff Hedrick, entered into an unconscionable adhesion grow-out contract with PPC titled "Broiler Production Agreement" (hereinafter "Agreement").

17.     Once the growers receive the chicks they care for the chicks for approximately 6 to 7 weeks depending on PPC's required weight of the bird at the end of the grow-out process.

18.     PPC is easily able to exert such control and enforce such unconscionable arrangements because it is virtually the only broiler integrator to which the local growers can turn without an additional outlay of hundreds of thousands of dollars.  There is virtually no other viable option, as TRIPLE R has been painfully made aware since PPC unlawfully terminated the poultry growing arrangement.  The Production Agreement gave PPC oligopsony power over TRIPLE R and all the other growers by entangling them in PPC' archaic, abusive and unconscionable payout system, better known throughout the industry as the "tournament system."

19.     This scheme benefits PPC in many ways.  PPC is able to exercise all the control that an employer would exercise over an employee, but with none of the responsibility.  PPC does not have to pay the grower minimum wage or overtime nor is it subject to the West Virginia Wage Payment and Collection Act; can literally require the grower to be on call 24 hours a day, seven days a week; is not responsible for workers compensation or unemployment insurance; is not liable under Title VII or the West Virginia Human Rights act for discrimination claims; and, can force the grower to bear all the costs of building and equipment maintenance and any upgrades it sees fit to require, often to the point where a grower must take out burdensome loans just to pay for the privilege of caring for PPC's chickens.

20.     The compensation for growers such as Triple R is meted out according to the so-called "tournament system."  Triple r was ranked against other PPC growers whose flocks were also processed at the Moorefield facility, based upon the "Marketable Broiler Live Weight" (basically the weight of the chickens when fully grown), divided by the "Weighted Average Formula Cost" (the cost of feed and medication PPC had to supply to care for the chickens).  Presumably, this tournament system should start with a level playing field for all the growers, but such is not the case.  The values upon which the tournament system is based are in no small part determined by the quality of chickens, feed and medicine provided by PPC to the individual growers.

21.     Defendant defrauded Plaintiffs through the tournament system and subjected Plaintiffs to unlawful practices by unilaterally imposing and utilizing a ranking system that can be, and in fact was, arbitrarily and capriciously manipulated.  By ranking individual growers, including Plaintiff, Defendant wrongfully pits each grower against the other, arbitrarily punishing what PPC deems to be a less successful grower based upon criteria which are virtually

under the total control of PPC, and which are never revealed, explained or discussed with the growers.

22.     The tournament system is designed to increase PPC's profits at the expense of, and to the severe detriment of, its growers, including Plaintiffs, and thereby decreasing the profits of its growers, including Plaintiffs.  PPC defrauded Plaintiffs by unilaterally imposing and utilizing the tournament system, which wrongfully placed Plaintiffs in competition with its fellow growers, all the while requiring Plaintiffs to accept chicks that are genetically different, and chicks in varying degrees of health.  Likewise, the feed supplied by PPC is of dissimilar quantity, quality and consistency, and is often delivered inappropriately and in an untimely manner.  Plaintiffs were ranked against each of the other growers even though they possessed dissimilar facilities, equipment and technology.  Additionally, Plaintiffs received differing degrees of technical assistance and was required to comply with management practices that were inconsistent with his fellow growers.

23.     The end result of the tournament system is the imposition of an arbitrary and capricious ranking of each grower, which is designed to insure PPC's ability to wrongfully control its cost of operations at the expense of its growers, including Plaintiff, and to maintain undue financial dominance over Plaintiff and his fellow growers.  Under this arbitrary and capricious system a chicken grower can rank at the top of his group for one flock, and then just eight weeks later, using the exact same animal husbandry practices, rank at the bottom of the group for the next flock.

24.     Despite its arbitrary internal ranking system, PPC receives the same sale price for its comparable products sold no matter the type of facilities and equipment that were located on the farm where the chickens were cared for.  PPC's tournament system is the classic "rob Peter

to pay Paul" scenario that is unfair, unjustly discriminatory and deceptive, as well as unduly and unreasonably prejudicial and disadvantageous to Plaintiffs and their fellow growers.

25.     The Defendant has and continues to fraudulently conceal from said growers, including Plaintiffs, material facts regarding the detrimental effect to said growers, including Plaintiffs, resulting from the tournament system.

26.     The key variables that determine growers' scores, ranking, and ultimately, their compensation, are entirely under PPC's control and therefore subject to manipulation without detection by the growers, enabling PPC to artificially depress a particular grower's payout, and which it did manipulate, in fact, to artificially depress Plaintiffs' payouts.

27.     The inequity of the tournament system was exposed in an online poultry publication article about a study done by the Poultry Science Association discussing the importance of certain determinative factors involved in the broiler grow-out process.

28.      The Poultry Science Association ("PSA") was established in 1908.  According to its webpage, https://www.poultryscience.org, the PSA is a professional organization consisting of approximately 1,800 educators, scientists, extension specialists, industry researchers, administrators, producers, and college students who are committed to advancing the poultry industry.  Since 1908, PSA has maintained a level of prestige that ranks it among the top professional organizations in the field. For over a century, PSA's member scientists have contributed through their research to the progress of the poultry industry and the development of safer and more nutritious food products for the consumer. Throughout this period, PSA has served – and it continues to serve – as the premier clearinghouse and publisher of basic and applied poultry research in the world. The application of research findings published in PSA's journals has been and remains a major contributor to the rapid growth and maturation of the meat

and egg industries. In addition, poultry-related research has made substantial contributions to the

overall understanding of human health and nutrition. Its webpage lists its objectives as follows:

    a. **To stimulate the discovery, application and dissemination of knowledge.**
    b. **To create a forum for the exchange of information among various segments of the poultry industry.**
    c. **To publish original research, reviews and timely information in the official PSA publications: Poultry Science® and the Journal of Applied Poultry Research.**
    d. **To recognize outstanding professional achievement.**

29.     In July of 2011 the PSA sponsored a symposium in St. Louis addressing the

future of the poultry industry, hot topics of current economics, and questions surrounding the

future of food agriculture. Experts in poultry science examined the fields of genetics, nutrition,

hatchery management, vaccination/immune modulation, coccidiosis control and antibiotic use. It

was discussed and reiterated in an article written by Christine Alvarado, Ph.D., a Professor at

Texas A & M University and published by WATT Ag Net.com,

https://www.wattagnet.com/articles/10194-genetics-plays-large-role-in-poultry-industry-s-future.

Portions of her article stated as follows:

> "The reason the industry has been so successful is improvements in genetic
> potential of breeds to achieve efficient production standards with proper nutrition,
> environmental management and health. Based upon the overall conclusions of the
> symposium, genetics is critical to the successful future of the industry. According
> to Leeson, genetics account for 90% of the current and future status of the poultry
> industry, while the remaining criteria of nutrition (5%), environment (3%) and
> health (2%) are considered supporting roles."

30.     Although PPC controls at least 98% of the of the grow-out process it ranks

growers as if they alone determine the outcome of the grow-out process thereby shifting all of its

economic risks in the grow-out process to the growers thereby using the tournament system

(settlement) as an unfair, unjustly discriminatory and deceptive rigid cost controlling device.

This allows PPC to pay its growers in a manner that causes huge swings in the amount of

compensation each grower receives in any given settlement.  This is done even though there are

countless variables controlled by PPC that exist between the inputs into the grow-out process on each grower's farm.

31.     Not surprisingly, the federal government recently also determined that poultry farmers, like the Plaintiffs, lack the independence needed to justify the award of small business loans.  In the Executive Summary of a March 2018 report entitled, "Evaluation of SBA 7(A) Small Business Administration Loans to Poultry Farmers," the Inspector General of the Small Business Administration (SBA OIG) summarized their findings:

> "We found that 7(a) loans made to growers did not meet regulatory and SBA requirements for eligibility.  The large chicken companies (integrators) in our sample exercised such comprehensive control over the growers that the SBA Office of the Inspector General believes the concerns appear affiliative under SBA regulations… Specifically, in our review of a sample of 11 7(a) loans made to growers, as well as a review of defaulted 7(a) loans to growers, we found integrator control exercised through a series of contractual restrictions, management agreement, oversight inspections, and market controls.  This control overcame practically all of a grower's ability to operate their business independent of integrator mandates.
>
> This control was enforced through close integrator oversight, management agreements, and grower-integrator communication.  A grower's failure to comply with these requirements could result in a significant decrease in integrator payments, a reduction in flock placements, or a cancellation of the contract.  A grower's economic viability was based upon a performing production contract with an integrator and is the true basis for grower income and facility value…"

The report goes on to state "entities are affiliates of each other when one controls or has the power to control the other.  It does not matter whether control is exercised, so long as the power to control exists."  The SBA OIG went on to state that their "observation of such control was further supported by research, studies, and reports from governmental, academic, and trade publications, as well as interviews with various lenders, growers, and staff of Federal agencies and academic institutions."

**PPC's Use of its Domination to Exploit Plaintiffs Hedrick and Triple R**

32.     Defendant PPC operates a poultry processing plant in Moorefield, West Virginia, and utilizes poultry growing arrangements whereby poultry growers care for poultry pursuant to PPC's instructions, as described in more detail above.

33.     Hedrick lives with his wife, Rachael Hedrick, on their farm, which they purchased in January of 2007 at a cost of approximately $1.45 million financed by a mortgage loan from a local bank.

34.     In late 2007, PPC contacted Hedrick about growing poultry for PPC. PPC personnel stated that upon its approval of Triple R's poultry facilities, PPC would place birds in the facilities and would enter into a poultry growing arrangement with Hedrick for the production of broilers.   They also promised Hedrick that as long as he grew a good bird, he would continue to receive placements of baby chicks from PPC.  Hedrick and Triple R entered into a 2007 Broiler Production Agreement (BPA) with PPC covering Plaintiffs' activities as growers for a five-year term from September 10, 2007 through September 10, 2012 (2007 BPA).

35.     Under the terms of the Broiler Production Agreement between PPC and Plaintiffs, PPC agreed to deliver flocks of chicks to Triple R's facility.  Before even entering into the Agreement, Triple R's facility had to satisfy PPC's strict requirements regarding design and specification subject to PPC' sole approval.

36.     At the end of the first flock grow-out process PPC specifically required Plaintiffs Mr. Hedrick and Triple R to upgrade certain of their poultry houses before PPC would continue to deliver chicks. To fund the required upgrades, Plaintiffs had to obtain another bank loan (besides the mortgage loan referred to above) in the amount of approximately $800,000.

37.     Once a flock was delivered, Triple R would then care for the birds according to strict and meticulous guidelines imposed by PPC.  When the flock matured, normally a six-week process, PPC would transport the flock to its processing facility in Moorefield, West Virginia.

38.     PPC's representations that Hedrick would continue to receive chickens was the primary inducement for Hedrick to enter into the agreement with PPC as well as to expend funds to improve his chicken houses. A well-constructed poultry house has an average life span of approximately 30 years.  However, with proper maintenance and improvements its life span can increase to 45 to 50 years. Hedrick needed thirty (30) years just to pay off the indebtedness.

39.     PPC knew that their representations to Hedrick that he would continue to receive chickens as long as he grew good birds were false and misleading, and were intended to induce Hedrick to improve his facilities in 2007, and on at least four (4) other occasions, at his expense, a precondition to PPC's continuing to contract with Plaintiffs.

40.     PPC designates one of its employees to oversee the operations of a particular grower such as Mr. Hedrick and Triple R. When Plaintiffs initially began growing chickens for PPC, these representatives were called "flock supervisors," a position title which accurately conveys the degree of micromanagement these PPC representatives exercise over a grower's activities. Subsequently, PPC changed the title to "service technicians," a term which masks the degree of control these representatives exercise over growers' operations.

41.     Some of the flock supervisors/service technicians (service techs) who controlled operations of Mr. Hedrick and Triple R were Amy Martin, Danny Eye, Fred Vandevender and David Simerly.

42.     PPC and its service techs and management exercised control over every aspect of Plaintiffs' grow-out operation as described in paragraphs above. In addition, with respect to feed,

PPC delivered three kinds of feed for each flock: started feed, grower feed, and finisher feed. PPC exercised unilateral control over when and at what stage of Plaintiffs' flocks, it would deliver each kind of feed, and/or change to the next type of feed.

43.     In 2014, PPC dictated to Plaintiffs that PPC had decided to reduce the weight of the chickens Plaintiffs were required to grow from 4 pound birds to 3.75 pound birds. PPC told Hedrick that it had decided to have him grow a lighter bird. PPC was in a position to earn the same revenues for the lighter birds because, on information and belief, PPC could add back the 0.40 difference in weight through water weight added to the bird, while Plaintiffs Hedrick and Triple R would receive lower pay for the lighter birds.

44.     On or about May 14, 2009, Plaintiffs Hedrick and Triple R entered into a new BPA with PPC, effective May 28, 2009 (2009 BPA). The 2009 BPA falsely and misleadingly referred to Triple R as an "independent grower."

45.     Paragraph A of the 2009 BPA stated falsely and misleadingly that:

> "The work and labor herein provided for [by Hedrick and Triple R] shall be done and performed by Independent Grower as an independent contractor and under its sole supervision, management, direction and control of day to day operations. [PPC] will not supervise Independent Grower's personnel or employees in the performance of such work or as to the manner, means and methods in which such work or labor is performed other than to assure that the Broilers are raised in compliance with applicable laws and regulations and the guidelines of [PPC]."

This statement was false and misleading inasmuch as PPC, rather than the so-called "independent grower" controlled all aspects of the raising of the broilers on the grower's farm, as detailed above.

46.     The control exercised by PPC over Plaintiffs' operations is illustrated by the following events, which are merely exemplary and not exhaustive:

a. In or about March of 2007, Danny Eye, a so-called service tech told Mr. Hedrick that he would have to change the heater in the back of some of his houses, or PPC would not deliver chicks to them;

b. It was an ongoing occurrence that when Mr. Hedrick ran out of feed, a service tech told him that it was not the tech's responsibility to ensure that he had sufficient feed, but then the tech told Mr. Hedrick that he could not independently order feed from another source besides PPC;

c. In or about May 2013, PPC placed Plaintiffs Triple R and Hedrick into their so-called "Cost Improvement Program" in accordance with Exhibit B of the BPA. Under this program, PPC continued to exercise control of Plaintiffs' grow-out operations. PPC informed Plaintiffs in a letter dated May 31, 2013, that "[t]he following will be used to help improve performance on your broiler farm:"

   i. Intensive management program with your service tech and Pilgrim's management.

   ii. [Hedrick and Triple R were required to] [f]lush all water lines with an approved cleaner before birds are placed as recommended by your service tech.

   iii. [They were to] [c]heck chlorine levels regularly to be sure they are not too low, or too high.

   iv. All equipment must be working properly, and if broken must be fixed in a timely manner as recommended by your service tech. Service tickets indicate some stoves not working, problems with static pressure modules, and problems with vents not opening properly (sticking).

   v. All Pilgrims management guidelines for temperature, ventilation, mortality collection, litter management, etc., must be followed as stated in the [BPA]. Posted temperature and ventilation guidelines, and/or recommendations by your service tech or management must also be followed.

   vi. Water Meter Readings must be recorded either manually, or in your computer daily.

   vii. Use large supplemental feed lids for brooding, and move these down when turning chicks out, as recommended by your service tech and/or management. Be sure feed runs the entire length of paper in brood chamber before placement."

d. The PPC letter ended by stating: "If performance hasn't improved, additional measures will be taken [by PPC] to improve performance."

e. Pilgrims service technicians did not evidence on their service reports that sick, hot or dehydrated birds were delivered the Plaintiffs' far

f. Pilgrims never responded to Plaintiffs' concerns or compensated Plaintiffs for their fifty percent (50%) or more increase in utility costs.

g. Pilgrims would not allow Plaintiffs adequate time to get ready to receive new flocks even though Pilgrims knew it took longer to get a twelve house farm ready.

h. Pilgrims required Plaintiffs to needlessly replace all sight tubes, i. e. clear tubes in the water lines.

i. Pilgrims needlessly shutdown Plaintiffs operation for 63 days in December of 2015 even though they knew that a local company had informed Plaintiffs that they would come to work on the stoves in a timely fashion.

j. Plaintiffs consistently experienced high mortality in certain houses and received no explanation whatsoever from Pilgrims.

k.  Pilgrims technicians would purposely unscrew the light bulbs in Plaintiffs' broiler houses supposedly to dim light.

l.  Pilgrims technicians would purposely change settings on the computers in Plaintiffs' broiler houses.

m.  Pilgrims would require Plaintiffs to needlessly and excessively increase the time that fans would operate with no additional compensation given to Plaintiffs.

n.  Pilgrims did not require additional bio-security measures for its catch crews even though it was well known the Pilgrims flocks had an ongoing dermatitis problem.

o.  Pilgrims refused to meet with Eric and Mike Weaver to discuss grower concerns and informed them that they would not recognize the Contract Poultry Growers Association of the Virginias.

47.  The Defendant knowingly made, and continues to make, materially false representations, both written and oral, about future income, costs, expenses, company policies and working relationships to Plaintiffs, or concealed related material facts and information, including but not limited to, the "tournament system" and the inequities related thereto to accomplish this inducement, knowing that Plaintiffs were ignorant as to the falsity of these representations and that it would accept them as the truth and rely thereon to its own consequence and proximate injury.  Plaintiffs were required to financially encumber real and personal property and to convert its real property to a sole use thereby functionally depreciating said property and devaluing said property and rendering Plaintiffs as a mere tenants, totally at the mercy of the Defendant.

48.  During the course of their relationship prior thereto, and continuing to the present PPC materially misled Plaintiffs as to the financial prospects of growing poultry for Defendant. PPC was aware that said profit projections were false and misleading when made and has been guilty of malice and bad faith in making said material misrepresentations.

49.  For example, in or about February 2016, PPC provided Mr. Hedrick and Triple R with a document on PPC's letterhead titled an "Estimated Cash Flow" for a chicken house of 38,626 square feet, which would be roughly comparable to Plaintiffs' chicken houses. This

document represented that a grower could expect an average per flock payment from PPC of $97,741 if the grower used a "tunnel fog" type ventilation system, and a payment of $100,164 if using a "cool cell" system.  According to this document, the grower would gain a net return, less annual expenses, of $23,138 per flock for a tunnel fog system, and $24,265 for a cool cell system.

50.     Mr. Hedrick and Triple R raised approximately 1.8 million birds per year for PPC from January 2007 through November 2016, or a total of 67 flocks over the life of the parties' contractual relationships.

51.     Thus, according to the information in the "Estimated Cash Flow" documents, Mr. Hedrick and Triple A reasonably could have anticipated total net revenue of over $700,000 over the ten or so years they grew chickens for PPC.

52.     In actual fact, Triple R and Mr, Hedrick received net income over the ten or so years of – (minus) $1,541,050.

53.     Beginning in approximately September, 2007, Plaintiff Hedrick began gathering with other farmers growing chickens for Defendant PPC to share their complaints and frustrations from their dealings with Defendant.

54.     In 2008, Hedrick joined the newly re-organized Contract Poultry Growers Association of the Virginias (hereinafter "CPGAVA") and later became a Director of CPGAVA on or about June of 2008.

55.   The CPGAVA is an agricultural cooperative association formed pursuant to similar state cooperative statutes and that is comprised of "producers of agricultural products" as defined in Section 19-4-19 of the West Virginia Code, and includes an organization whose membership

is exclusively limited to agricultural producers and dedicated to promoting the common interest and general welfare of producers of agricultural products.

56.     In or about December of 2010, Plaintiff Hedrick spoke at a meeting convoked by the United States Government, specifically the Department of Justice, to discuss problems and abuses with integration in the chicken growing industry.  Following Plaintiff Hedrick's participation in the CPGAVA, and his the United States Government meeting, he began to suffer reprisals by PPC. These reprisals included the following:

57.     During the course of their relationship, Defendant knowingly and willfully furnished to Plaintiff substandard food for the chicks that resulted in a financial loss to the Plaintiff.  On at least one occasion, PPC delivered to Hedrick and Triple R a lot of feed containing corn with mold. Said actions were done knowingly and willfully and constitute bad faith on the part of said Defendant.

58.     During the course of their relationship, Defendant on at least one occasion knowingly and willfully furnished to Plaintiff diseased chicks that resulted in a financial loss to the Plaintiff.  Said actions were done knowingly and willfully and constitute bad faith on the part of said Defendant.

59.     During the course of their relationship, Defendant knowingly and willfully failed to provide needed medication for the chicks that resulted in a financial loss to the Plaintiff.  Said actions were done knowingly and willfully and constitute bad faith on the part of said Defendant.

60.     Defendant deliberately and in bad faith took certain actions that resulted in the inaccurate and deceptive weighing of chickens that resulted in financial loss to Plaintiff.  These actions include, but are not limited to, delay in weighing the birds that resulted in reduced live weight.

61.     Defendant imposed arbitrary and unjustified requirements on Plaintiff under threat of refusing to furnish chickens unless additional expenditures were made, including, but not limited to, forcing it to invest in new equipment when others growers were allowed use older equipment and imposing unjustified conditions on Triple R that were not required of other growers.

62.     Over and above the basic unconscionability of the Broiler Production Agreement, PPC did not abide by its own terms imposed in the Agreement.

63.     Under the most recent Broiler Production Agreement signed February 24, 2012, a document created solely by PPC, and in which no term was ever negotiated or even offered for negotiation, the "term" of the Agreement was to be on a "flock to flock" basis, and PPC would not terminate the Agreement without "first requiring [Plaintiff] to follow the 'Cost Improvement Program'" as defined in the Agreement unless the termination was for "cause" or "economic necessity."  The Agreement incorporated Grain Inspection, Packers and Stockyards Administration ("GIPSA")-mandated changes that PPC began using in all of its Broiler Production Agreements on or about January 10, 2010, including but not limited to allowing the growers a reasonable time to make improvements, not being required to make unnecessary upgrade and requiring Defendant to afford growers the opportunity to participate in a Cost Improvement Program" prior to termination for poor performance.

64.     Defendant effectively and unilaterally breached the Broiler Production Agreement without proper cause on or about September 6, 2016 without allowing or even offering to Plaintiff an opportunity to participate in PPC "Cost Improvement Program."

65.     Defendant's decision to refuse to help Plaintiffs and cease sending flocks to Plaintiff as of October 28, 2016 left the Plaintiffs with no means of paying the mortgage that the

Plaintiff had on its farm, including the homes in which Eric Hedrick's children and grandchildren live, and furthermore left Plaintiff with no means of staying current on its utility bills, which was PPC' purported reason for terminating the Agreement.

66.     Even though in March 16, 2012, PPC and the Plaintiffs agreed that the relationship would continue and executed a new BPA requiring PPC to continue placing chicks on Hedrick's farm in accordance with the terms of the BPA. Since that time, PPC have continued to deny the placement of chicks on Hedrick's farm.

67.     Before PPC stopped placing chicks on Plaintiff's farm, Plaintiff had planned to operate the broiler houses on the farm for at least twenty five (25) more years.

68.     Plaintiffs reasonably relied on the PPC's representations concerning the longevity of the relationship and the promises from PPC personnel that they would be placing chicks on his farm, to his detriment and did not know that the representations were false until PPC informed him that they would not be placing chicks on his farm and subsequently failed to provide chicks in November of 2016.

### CLAIMS FOR RELIEF
### COUNT I
### VIOLATION OF PACKERS AND STOCKYARDS ACT

69.     The Plaintiffs reallege and incorporate by reference in this claim the allegations contained in the preceding and subsequent paragraphs of this complaint.  The Defendants used their power over the Plaintiffs and decided to retaliate against Plaintiffs because of his membership in the CPGAVA and upon his many activities on behalf of poultry growers in West Virginia. Originally performance of Plaintiffs Hedrick and/or Triple R as a grower for PPC was consistently average or above average.  Thus, neither their performance nor the operation of the farm could have been grounds for the PPC's unlawful treatment of the Plaintiffs. Settlements

were average or above for the first few years.  Then Hedrick made the fatal mistake of speaking out against the Companies at the Department of Justice/ Department of Agriculture Town Hall Meeting on Capitol Hill in DC in 2010.  After this, settlements started going down drastically. Triple R began losing anywhere from $17K to $30K a flock.  Then on December 24, 2015 PPC brought Hedrick a letter stating that PPC was not bringing the Plaintiffs birds until they got all the heat fixed in the houses.  As mandated by PPC, Triple R was attempting to get things fixed. Triple R had service calls in to Sion Equipment and Poultry Spec but Triple R was not a priority because it did not have birds in its houses.  This resulted in Triple R being out of production for 64 days.  Subsequently Triple R had the best ranking in the settlement (Tournament) it had received in a long time.  The very next flock Triple R was back down on the bottom.  Triple R had to refinance to be able to keep up with its mortgage payments and operating expenses. However Triple R was forced to close its doors and cease providing grow-out services on November 4, 2016. After nine years of providing grow-out services for PPC, Triple R owed more than when it first started.  Triple R was left approximately $2.3M in debt. This debt has only continued to increase. Hedrick has also appeared in several documentaries about the deplorable plight of broiler growers in the United States. These documentaries were eventually produced and aired on social media, the internet, cable and satellite television across the country.

70.     The grounds given to Hedrick for this unlawful treatment and breach of the terms of the PPA was a pretext for the actual reason, which was to punish Hedrick financially, to put Hedrick out of the poultry business and to stop or hinder his cooperative association activities.

71.     The conduct described above constitutes unjustly discriminatory and deceptive practices by the defendant and PPC's agents and employees, all in violation of the Packers & Stockyards Act, 7 U.S.C. § 192(a).

73.     The conduct described above resulted in Hedrick being subjected to undue and unreasonable prejudice, and disadvantage; all in violation of the Packers & Stockyards Act, 7 U.S.C. § 192(b).

74.     PPC's breach of its poultry growing arrangement with Hedrick and Triple R was without economic justification and thus, were in violation of the Packers and Stockyards Act, 7 U.S.C. § 192(b).

75.     As a direct and proximate result of Defendants' violations, Plaintiffs suffered and incurred substantial damages. These damages include lost business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be determined by a jury and the Court.

**COUNT II**
**VIOLATION OF AGRICULTURAL FAIR PRACTICES ACT**

76.     The Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

77.     Pursuant to the definitions provided by the AFPA, 7 U.S.C. § 2302, PPC are "handler(s)", Hedrick is a "producer", and the CPGAVA is an "association of producers".

78.     The AFPA, 7 U.S.C. § 2303 makes it unlawful for BPC, or any of its employees or agents to refuse to deal with Hedrick and Triple R because of Hedrick's membership in the CPGAVA, to discriminate against Hedrick because of his membership in the CPGAVA, or to coerce or intimidate Hedrick to terminate his membership or activities on behalf of the CPGAVA.

79.     The defendants breached PPC's relationship with Hedrick and failed to deliver his birds in accordance with the terms of their agreement because of his membership in and his and his husband's activities on behalf of the CPGAVA.

80.     The Defendants' breach of the of the BPA between Triple R and PPC and the decision to not to deliver birds in accordance with the terms of the BPA  were intended to stop Plaintiff's activities exposing the wrongful and unlawful practices of the poultry industry and other efforts on behalf of the CPGAVA and other poultry growers, to stop Hedrick's membership and leadership activities with the CPGVA, and to intimidate other PPC growers who were members of the CPGAVA or who were considering becoming members of the CPGAVA.

81.     As a direct and proximate result of Defendants' violations, Plaintiffs suffered and incurred substantial damages. These damages include lost business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be determined by a jury and the Court.

## COUNT III
## FRAUD

82.     The Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

83.     PPC in late 2006 represented to Hedrick that as long as he grew good birds, he would continue to receive placements of baby chicks from PPC.

84.     PPC's representation that he would continue to receive chickens was the primary inducement for Hedrick to enter into the agreement with PPC as well as expend funds to improve

his chicken houses. A well- constructed poultry facility has a life span of approximately 30 years and Hedrick needed at least ten (10) years just to pay off the indebtedness.

85.     PPC knew that their representations to Hedrick that he would continue to receive chickens as long as he grew good birds were false and were intended to induce Hedrick to improve his facilities on at least four different occasions at his expense and to continue to contract with PPC.

86.     During the latter part of October, 2016, PPC picked up the flock of broilers on the Hedrick farm for processing and, in conformance with the BPA and Hedrick began preparing his poultry houses for the next flock. He was told by PPC personnel that he would be getting chicks placed on his farm in a few days.

87.     In accordance with Pilgrims' normal procedure Hedrick knew that chicks would be placed on his farm in the second week of November 2016.

88.     The Plaintiffs reasonably relied on the past statements of Pilgrims and did not know that the representations were false until PPC personnel informed Hedrick that they would not be placing chicks on his farm and subsequently failed to provide chicks in second week of November, 2016.

89.     Plaintiffs reasonably relied on the defendants' representations concerning the longevity of the relationship and the promises from PPC personnel that they would be placing chicks on his farm to their detriment and did not know that the representations were false until PPC informed Hedrick that they would not be placing chicks on his farm and subsequently failed to provide chicks in November of 2016. To date PPC continues to refuse to supply chicks to Hedrick's farm.

90.     As a direct and proximate result of Defendants' violations, Plaintiffs suffered and incurred substantial damages. These damages include lost business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be determined by a jury and the Court.

91.     As a proximate result of the fraudulent acts of Defendants, the Plaintiffs have suffered damages in excess of $75,000.00.

**COUNT IV**
**BREACH OF CONTRACT**

92.     The Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

93.     The Defendants deliberately and maliciously refused to honor the requirements of first paragraph section F of its BPA to continue to place birds on the Plaintiff's farm.

94.     As a proximate result of the breach by the defendants, the Plaintiffs have suffered damages in excess of $75,000.

95.     As a direct and proximate result of Defendants' violations, Plaintiffs suffered and incurred substantial damages. These damages include lost business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be determined by a jury and the Court.

**COUNT V**
**BREACH OF THE IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**

96.     Plaintiffs re-allege each and every allegation as set forth above, and thereby incorporate same by reference, as if all were set forth fully therein.

97.     The BPA and the broiler growing arrangement as well as the longstanding relationship between the parties contains an implied covenant of good faith and fair dealing that the parties would deal fairly and honestly with each other and would not do anything that would have the effect of destroying or injuring the right of the other party to receive the fruits of the agreement.

98.     PPC intentionally took actions to destroy Plaintiff's business.  Defendant acted in bad faith by alleging baseless defaults, imposing arbitrary restrictions and obligations on Plaintiff, and intentionally causing Plaintiff to rank at the bottom of the tournament system.

99.     Defendant thereby breached its duty of good faith and fair dealing with Plaintiff by, inter alia, taking actions to destroy Plaintiff's business.  As a direct and proximate result of the intentional wrongful acts of the Defendant and its agents, Plaintiff suffered damages and, if evicted from its property will suffer even more significant damages including but not limited to imminent loss of its property, loss of profits, loss of goodwill, attorneys' fees, and other legal expenses.

100.    As a result of the actions of Defendant have violated the implied covenant of good faith and fair dealing contained in the agreements as against Plaintiffs herein, and as a result thereof, Plaintiffs are entitled to their damages incurred.

101.    The foregoing actions were intentional, willful and wanton, and done toward Plaintiffs with sufficient fraud, malice, and oppression to warrant the imposition of punitive damages against Defendant.

## COUNT VI
## NEGLIGENT, WILLFUL AND RECKLESS
## MISREPRESENTATION

102.     The Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs.

103.     PPC represented to Hedrick that they would not place birds on Plaintiffs' farm because Hedrick had grower management problems. PPC's representations regarding Plaintiffs' so-called grower management problems performance were negligently, willfully and recklessly prepared and presented and were material and intended to show that the Plaintiffs' the management problems were a true, correct, and fair analysis.

104.     As a proximate result of the misrepresentations by the defendants, the plaintiff has suffered damages in excess of $75,000.

**DAMAGES**

105.     As a direct and proximate result of the wrongful acts of the defendant, Plaintiff Triple R, LLC have sustained serious loss and economic injuries.  Plaintiff, Hedrick, has endured economic loss, physical pain and suffering, mental anguish, anxiety, embarrassment, and public humiliation as a result of the acts of the Defendant and will be caused to endure same in the future as a direct and proximate result thereof.  Further, the conduct was malicious, willful, intentional, and designed to injure Plaintiffs Hedrick and Triple R and punitive damages should be awarded along with all costs and attorneys' fees.

**WHEREFORE**, Plaintiffs pray that this Honorable Court:

a.  assume jurisdiction over this action;
b.  award Plaintiffs compensatory damages against Defendant in an amount the jury or trier of fact determines will compensate Plaintiffs for their losses and damages suffered,
c.  award Plaintiffs consequential damages against Defendant in an amount the jury or trier of fact determines will compensate Plaintiffs for their losses and damages suffered,
d.  award punitive damages against Defendant in an amount that the jury or trier of fact determines is adequate to punish Defendant for their wrongful conduct and to deter others from similar conduct in the future, and/or nominal damages as may be appropriate;
e.  award Plaintiffs reasonable costs and attorneys' fees associated with this action;

    f.   award Plaintiffs such other equitable and legal relief to which they may be entitled to
receive.

    **WHEREFORE**, the Plaintiffs pray for judgment on their complaint, for an award of

compensatory and punitive damages in an amount to be determined at trial, for an award of

attorney's fees pursuant to 7 U.S.C. § 2305, and for all other relief to which the Plaintiffs may be

entitled.

**JURY DEMAND**

    Plaintiffs demand trial by jury.

    Respectfully submitted this 25th day of October, 2018

By:         /s/ Keith Lively
          Keith Lively, Esq. (WV Bar #8919)
          Doyle, Barlow & Mazard, PLLC
          1010 Temple Street
          Hinton, WV 25951
          703.862.0215 (tel)
          202.589.1819 (fax)
          klively@dbmlawgroup.com

By:    **Government Accountability Project, Inc.**

          **Jack A. Kolar, Esq. (DC Bar #292953)**
          (Pro Hac Admission Pending)
          Jackk@whistleblower.org
          (202) 457-0034, ext. 197
          **Karen J, Gray, Esq. (DC Bar #488760)**
          (Pro Hac Admission Pending)
          Kareng@whistleblower.org
          (202) 457-0034, ext. 122
          **Amanda Hitt, Esq. (DC Bar #100835)**
          (Pro Hac Admission Pending)
          Amandah@whistleblower.org
          (202) 457-0034, ext. 159.
          1612 K Street, NW, Suite 1100
          Washington, DC  20006

**J. DUDLEY BUTLER (MS Bar #7626)**
**BUTLER FARM & RANCH LAW GROUP, PLLC**
*Pro hac admission pending*
499-A Breakwater Dr.
Benton, MS  39039
(662) 673-0091 (tel)
(662) 673-0091 (fax)
jdb@farmandranchlaw.com
*Attorneys for Plaintiffs*
*Triple R Ranch and Eric Hedrick*