# EXHIBIT D



October 28, 2016

Mr. Eric K. Hedrick  *Via hand delivery & certified mail, return receipt requested*
Triple R Ranch LLC
HC 32, Box 63E
Upper Tract, WV 26866

Re: Pilgrim's acceptance of Triple R Ranch LLC's decision to terminate its broiler production agreement

Dear Mr. Hedrick:

You previously signed a Broiler Production Agreement ("Agreement") with Pilgrim's Pride Corporation ("Pilgrim's") for Triple R Ranch LLC broiler farm that became effective on March 16, 2012. Section C of the Agreement states the following:

> C. <u>Term</u>. The term of this Agreement shall commence on the date of execution of this Agreement, continue on a flock to flock basis, and shall terminate upon completion of the engagement(s) subject to the right of the Independent Grower or the Company to terminate this Agreement upon written notice as provided in this Agreement.

(Emphasis added). Section D sets forth the bases for Pilgrim's or Triple R Ranch LLC to terminate the Agreement. For purposes of this letter, the relevant portion of Section D is as follows:

> D. <u>Termination</u>.
>
> \* \* \*
>
> Either the Independent Grower or the Company shall have the right to terminate this Agreement and its Exhibits without any need for cause provided that written notice is given at least 90 days prior to the termination of this Agreement. Any such written notice from the Independent Grower shall be given to the Live Production Manager or Broiler Manager.

As a courtesy to you, a signed copy of the Agreement is attached hereto for your convenience.

On Monday, October 3, 2016, Pilgrim's received an email from your email address stating that Triple R Ranch LLC "will not be taking any more chicks after this flock we have now is finished. We are closing our doors." The email was sent by Rachel and you on behalf of Triple R Ranch LLC.

Eric K. Hedrick
October 28, 2016
Page 2

Pilgrim's accepts Triple R Ranch LLC's decision to terminate the Agreement. Additionally, Pilgrim's waives its right to receive 90-days' notice of termination from Triple R Ranch LLC. Accordingly, per Triple R Ranch LLC's request and representation that it is "closing [its] doors," no further chicks will be delivered to the farm's poultry houses now that the current flock has been removed for processing.

Thank you for your previous service as a Pilgrim's independent contract poultry grower.

Sincerely,

*[signature]*

Randy Stroud
Senior Vice President – Live Technical Services

Encl.



COMPLEX LOCATION: BROADWAY, VA / MOOREFIELD, WV

## PILGRIM'S PRIDE CORPORATION
## BROILER PRODUCTION AGREEMENT

This Pilgrim's Pride Corporation Broiler Production Agreement (hereinafter "Broiler Production Agreement" or "Agreement") is made and entered into by and between PILGRIM'S PRIDE CORPORATION, hereinafter called the "Company" and ___Triple R Ranch LLC___ hereinafter called the "Independent Grower", effective the __16__ day of __March__, 20__12__.

WHEREAS, Company is engaged in, among other things, the growing and processing of broiler chickens (hereinafter referred to as "Broilers"),

WHEREAS it is necessary that such Broilers be raised in conditions to comply with applicable regulations and to ensure that the Broilers are of acceptable quality,

WHEREAS the Independent Grower has the proper farm, facilities and equipment to raise Broilers for eventual processing, and

WHEREAS it is the desire of both the Company and the Independent Grower that this phase of the work be done by the Independent Grower,

NOW, THEREFORE, in consideration of the mutual covenants and promises of the parties hereof, the Company and the Independent Grower covenant and agree as follows:

A.      Engagement of the Independent Grower. Subject to the terms and conditions of this Agreement, Independent Grower hereby covenants and agrees to perform the work and labor necessary to maintain the proper facilities to raise and prepare Broilers to be caught and caged for processing for the Company. Such Agreement is to continue unless terminated in accordance with the provisions hereinafter contained. The work and labor herein provided for shall be done and performed by Independent Grower as an independent contractor and under its sole supervision, management, direction and control of day to day operations. The Company will not supervise Independent Grower's personnel or employees in the performance of such work or as to the manner, means and methods in which such work or labor is performed other than to assure that the Broilers are raised in compliance with applicable laws and regulations and the guidelines of the Company.

### ADDITIONAL CAPITAL INVESTMENTS. ADDITIONAL LARGE CAPITAL INVESTMENTS MAY BE REQUIRED OF INDEPENDENT GROWER DURING THE TERM OF THE AGREEMENT.

B.      Fee. The fee paid by the Company to the Independent Grower for the performance of services by the Independent Grower in connection with the engagement(s) shall be determined as described in Exhibit A. Independent Growers that are company employees (or immediate family members of an employee) or broiler service contractors will be excluded from the calculations used to determine the average grower costs.

C.      Term. The term of this Agreement shall commence on the date of execution of this Agreement, continue on a flock to flock basis, and shall terminate upon completion of the engagement(s) subject to the right of the Independent Grower or the Company to terminate this Agreement upon written notice as provided in this Agreement.

D.      Termination. Independent Grower shall have a right to terminate this Agreement until 12:00 Midnight on the third business day after the day on which Independent Grower signs the Agreement. Independent Grower shall provide written notice of termination to the Live Production Manager or Broiler Manager.

Either the Independent Grower or the Company shall have the right to terminate this Agreement and its Exhibits without any need for cause provided that written notice is given at least 90 days prior to the termination of this Agreement. Any such written notice from the Independent Grower shall be given to the Live Production Manager or Broiler Manager. Any such written notice shall be given from the Company to the Independent Grower stating the reason(s) for termination, when the termination is effective, and appeal rights, if any, that the Independent Grower may have with the Company. Termination during a flock shall be in accordance with the other terms of this Agreement. Should such termination occur, the Company agrees to pay the Independent Grower for all services performed in accordance with this Agreement until termination of this Agreement, and the Independent Grower agrees to perform all obligations until termination of this Agreement. Except for cause or economic necessity, Company will not terminate this Agreement without first requiring Independent Grower to follow the "Cost Improvement Program" as described in Exhibit B.

In the event of gross negligence or abandonment of the Broilers by the Independent Grower, the Company shall have the right to take over the care and possession of the Broilers on Independent Grower's poultry farm and complete the grow out in any manner Company sees fit, with any and all expense incurred by Company being charged back to the Independent Grower, and at the Company's option this Agreement, at that time, may be terminated as provided in this Agreement.

Independent Grower's default under any financing agreement and/or levy, seizure, or attachment of Company property, insolvency or bankruptcy of the Independent Grower, shall be considered a material breach of this Agreement and/or its Exhibits, and the Company shall have the right to take over said work and complete it in any manner it sees fit, with any and all expense above that the Independent Grower would have normally received for the job being charged back to the Independent Grower, and at the Company's option this Agreement, at that time, may be terminated.

E. <u>Representations and Warranties of Independent Grower</u>. The Independent Grower hereby represents and warrants to the Company and agrees that:

(1) Independent Grower will neither represent nor hold itself out to be an employee, agent, partner, representative or joint venture of or with the Company;

(2) Independent Grower will pay all state, local and federal taxes which may arise from the provision of services under this Agreement;

(3) Independent Grower will comply with all applicable local, state and federal laws, rules and statutes;

(4) Independent Grower has or will procure all licenses or permits necessary or required to carry on its business in the locations in which the Independent Grower operates

F. **RESPONSIBILITIES OF THE COMPANY:**

1) <u>Chicks.</u> The Company will provide the Independent Grower with chicks placed from the hatchery without bias in their selection. The Company retains title to these chicks and bears the specified costs of producing them prior to delivery to Independent Grower. The Company will provide the Independent Grower with proper advance notice of the chick delivery time.
2) <u>Feed.</u> The Company will provide the Independent Grower with the feed necessary to produce the broilers. The Company retains title to any feed and bears the specified costs of the feed and the right to retain or dispose of excess feed.
3) <u>Scheduling, Number and Breed.</u> The Company shall determine the number, frequency of placement, size of broiler, and breed of birds. The Company will determine when and where the broilers shall be processed and will notify the Independent Grower of the processing arrangements.
4) <u>Catching and Hauling.</u> The Company will provide the labor and equipment necessary to catch and load the broilers, and to haul the flock to a processing plant at no cost to the Independent Grower.
5) <u>Property Damage.</u> Any damage or theft to Independent Grower's property or equipment that occurs during catching, hauling or feed delivery that is proximately caused by the negligent act or omission of the Company or parties under its control, provided that it is promptly reported and verified, will be reimbursed or replaced without cost to Independent Grower by the Company or parties under its control.
6) <u>Documents.</u> The Company agrees to furnish copies of the Independent Grower's chick delivery tickets, feed tickets, medication tickets, live weight tickets, condemnation certificate, settlement sheet, and a ranking sheet of all settlements for the week that the Independent Grower settled.
7) <u>Record Maintenance.</u> The Company will maintain records of each Independent Grower's account for the legally required time period.
8) <u>Certified Scales.</u> The Company will provide certified scales to be used to weigh live broilers and feed. The Company shall use certified weigh masters to operate these scales. The Company shall make arrangements to use alternate certified scales in the event the primary scale is inoperable.
9) <u>Observation of Weighing.</u> The Company agrees that the Independent Grower or a family member / farm manager is entitled to observe the weighing of feed to be delivered to, or the weighing of the live broilers from, his/her farm provided that such actions do not interrupt the normal production flow of the Company's operations.
10) <u>Payment.</u> The Company agrees to pay the Independent Grower for services hereunder in accordance with Exhibit A hereto.
11) <u>Veterinary Services.</u> The Company will provide veterinary services as necessary at no cost to the Independent Grower. The veterinarian shall be selected solely by the Company. The Company retains title to any medication that is left on Independent Grower's farm.
12) <u>Technical Assistance.</u> The Company will provide technical advice at no cost to the Independent Grower. The Company's Field Service Supervisors shall visit the Independent Grower periodically to give advice and assistance as required to help maximize broiler performance.
13) <u>Risk of Loss.</u> The Company will bear the financial risk of loss of birds, feed, and medication while these properties are in the Independent Grower's possession, provided that such properties were not damaged or lost due to a negligent act or omission of Independent Grower or parties under its control or due to a breach of Independent Grower's contractual obligations under this Agreement. The Company retains title to any supplies it left on the Independent Grower's farm.
14) <u>Disclaimer.</u> EXCEPT AS SPECIFICALLY SET FORTH HEREIN, COMPANY MAKES NO OTHER REPRESENTATIONS, GUARANTEES OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE INDEPENDENT GROWER'S OPERATIONS UNDER THIS AGREEMENT.

G. **RESPONSIBILITIES OF THE INDEPENDENT GROWER:**

1) <u>Basic Housing.</u> The Independent Grower shall provide and maintain proper housing, equipment, litter and utilities in accordance with the Company's specifications and applicable regulations.
2) <u>Husbandry Methods.</u> The Independent Grower agrees to follow applicable laws and regulations as well as the Company's written and verbal management recommendations, including, but not limited to, watering, feeding, brooding, sanitation, litter, vaccination, medication, house environment, lighting, pest control and biosecurity.
3) <u>Labor.</u> The Independent Grower agrees to provide the labor necessary to provide good husbandry during the growing period. The Independent Grower or his/her agent must be present when baby chicks arrive and furnish adequate labor to unload chicks.
4) <u>Catching Preparation.</u> The Independent Grower will prepare the house for catching and follow the recommended feed withdrawals. The Independent Grower or his/her agent must be present to walk the houses with the crew foreman prior to the beginning of catching and to determine the number of dead birds. Otherwise, the Independent Grower will accept the crew foreman's determination of the number of dead birds. Independent Grower will allow catching crews to utilize any needed fans and utilities.
5) <u>Roads.</u> The Independent Grower will maintain all-weather roads to the chicken houses and provide adequate loading pads and space to turn vehicles. Failure to maintain roads, loading pads and turn-arounds will make the Independent Grower liable for wrecker services and damages sustained by the Company in accessing the facility.
6) <u>Waste Disposal.</u> The Independent Grower will dispose of all dead birds, manure and poultry house litter in accordance with the Dead Bird and Poultry House Litter Best Management Practices provided in Exhibit C to this agreement. Further, the Independent Grower agrees to dispose of all dead birds and poultry house litter in accordance with all applicable federal, state, and local laws, rules, and regulations where more stringent than the Best Management Practices provided in Exhibit C. Independent Grower agrees to have applied for or have a Waste

Management Plan from the local office of the Natural Resource Conservation Service or similar agency or otherwise be in compliance with such agency requirements.

7) **Biosecurity.** Independent Grower agrees to prohibit the presence of poultry, fowl or ratites of any kind on his/her farm other than that provided by the Company. Independent Grower also agrees to make every effort to limit the movement of non-essential people, vehicles and equipment in and around the poultry houses. In the event of a contagious disease outbreak threatening Independent Grower's farm, Independent Grower will comply with the directives of all local, state and federal agencies, as well as the guidelines of the Company.

8) **Animal Welfare.** Company maintains a program of animal welfare that is designed to eliminate unnecessary harm and suffering for poultry in the day-to-day operation of our production processes. Independent Grower represents and warrants that Independent Grower will comply with the Company and industry standards regarding animal welfare including, but not limited to, the following provisions.

   A. Independent Grower will follow live production practices that avoid unnecessary suffering, prevent destructive behavior, and prevent disease while promoting good animal health.
   B. Independent Grower will also follow the guidelines for animal welfare promulgated by the Company, included with the Grower guidelines, with the intent to promote the humane treatment and well-being of poultry through the production process.
   C. Any Independent Grower who violates the Company animal welfare policy and associated procedures will be subject to termination of their Broiler Production Agreement.

9) **Approved Materials.** Independent Grower agrees to not use any feeds, insecticides, medications, disinfectants, herbicides, pesticides, wood preservatives, floor treatments, rodenticide or other similar materials on the farm premises without the approval of the Company.

10) **Risk of Loss.** The Independent Grower will bear the financial risk of loss of Basic Housing, Labor, Catching Preparation, Roads and Waste Disposal, provided that such loss is not due solely to a negligent act or omission of the Company or parties under its control.

11) **Safe Work Environment.** Independent Grower agrees to maintain a safe working environment for representatives of the Company and their vehicles that must enter the premises to carry out their work assignments. Independent Grower shall allow Company employees, vehicles or agents to enter the premises at any time.

12) **Compliance With All Laws and Regulations.** Independent Grower agrees to comply with all applicable regulations and laws, whether federal, state or local.

13) **Record Keeping.** Independent Grower agrees to keep accurate records of mortality and other detailed information deemed necessary for sound management by the Company.

14) **Independence of Grower.** Independent Grower is an independent contractor and is not to be considered in any way an employee of the Company and Independent Grower shall be solely responsible for his/her own activities. Independent Grower will be responsible for all of his/her own agents, employees, and subcontractors as to wages, workers compensation, unemployment insurance, and all other normal and usual employer and employee expenses, and Independent Grower shall be responsible for all actions of those persons during their employment with the Independent Grower. Subject to the other provisions of this Agreement, Independent Grower may join or assist any association or organization of the Independent Grower's choice without any effect on this Agreement.

H.  **RESPONSIBILITIES OF COMPANY AND INDEPENDENT GROWER:**

1) **Best Efforts.** The Company and Independent Grower agree to use their best efforts in maintaining the broilers in such a manner that optimizes uniformity, health, livability, and the performance of the broilers to market age. If Independent Grower fails to use best efforts in management and/or housing of broilers and/or maintenance, or operation of equipment, the Company has the right (at its option) to suspend placements of chicks until such deficiencies are corrected.

2) **Transferability.** Independent Grower may not assign or transfer Independent Grower's rights or obligations under this Agreement and/or its Exhibits for the specific farm without the Company's prior written consent. Independent Grower understands and acknowledges that the Company reserves the right to require that there be improvements or upgrades to poultry houses or to equipment on such farm before the Company gives consent to any transfer, or grants a new contract, and the Company is under no obligation whatsoever to approve a transfer of the Independent Grower's rights or obligations under this Agreement and/or its Exhibits or grant a new contract. Company's rights and obligations under this Agreement and/or its Exhibits can be transferred or assigned without the Independent Grower's consent to any entity or other person acquiring Company by merger, or purchasing all or substantially all of Company's assets, or acquiring all or substantially all of the assets of the Company. Further, Company may, without Independent Grower's consent, transfer Independent Grower and the performance of Company's obligations under this Agreement to another of Company's Complexes. Additionally, Company may, without Independent Grower's consent, transfer Company's rights (but not any of its obligations) under this Agreement as collateral security to any lender(s) or agent(s) acting on its behalf providing secured financing to the Company. Upon notice of the occurrence of any event of default delivered to Independent Grower by such lender(s) or agent(s) under the applicable secured financing (which notice Independent Grower may rely on conclusively and without the consent of or notice to Company), the Company's lender(s) and agent(s) shall be entitled to exercise any and all rights and remedies of Company under this Agreement and Independent Grower shall comply with the exercise of such rights by Company's lender(s) and agent(s); provided that such lender(s) and agent(s) shall not be obligated to exercise any such rights, and the failure to do so shall not result in any liability to any such lender(s) or agent(s).

3) **Incurred Expenses.** Any agreed upon expenses paid by the Company on the Independent Grower's behalf under this Agreement are hereby authorized to be deducted from Independent Grower's payment prior to any other amounts being paid to Independent Grower or their assignees. The Company will provide an itemization of such deductions in writing at the time of payment.

4) **Liability and Indemnity of Independent Grower.** Subject to the provisions for arbitration as herein provided, Independent Grower agrees to indemnify, defend, and hold the Company, its officers, employees, agents, and representatives harmless against any and all claims, damages, liabilities, losses, actions, and expenses, including injury to any employee of or to any property of the Company, proximately caused by negligent acts or omissions of Independent Grower or his agents, employees, sub-contractors or parties under its control, in the performance of Independent Grower's duties hereunder. Independent Grower further agrees to indemnify, defend and hold the Company harmless from and against any and all losses, claims, damages, and actions, including federal, state, or local administrative actions, rulings and all other actions of any nature whatsoever which are in any manner caused by or which result from the presence of the broilers on the premises of Independent Grower, including, but not necessarily limited to matters involving emission complaints, disposal complaints, or pollution complaints, violation of law, and any negligent acts or omissions of Independent Grower in the performance of its obligations under this Agreement.

5) **Liability and Indemnity of Company.** Subject to the provisions for arbitration as herein provided, the Company agrees to indemnify, defend, and hold harmless the Independent Grower from and against any claims, damages, liabilities, losses and expenses for personal injury or

property damage (to property other than chicks or feed) proximately caused by negligent acts or omissions of the Company in the performance of its obligations under this Agreement.

6) THIRD PARTY PRODUCTS. THE COMPANY PROVIDES ANY THIRD PARTY PRODUCTS, SUCH AS MEDICINES AND VACCINES "AS IS," AND DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AS TO THOSE ITEMS, EXCEPT TO THE EXTENT PROVIDED BY MANUFACTURER.

7) Arbitration. Except as provided under Subsection xii, all claims between the Company and Independent Grower arising out of or relating in any way to the execution, interpretation and performance of this Agreement and/or its Exhibits, and/or the dealings between Independent Grower and Company, shall be submitted to binding arbitration conducted by a single arbitrator to be selected by the parties. If the parties cannot agree on a single arbitrator, then the single arbitrator shall be selected in the following manner: (i) the arbitration shall be conducted by the Dallas office of the American Arbitration Association ("AAA"); (ii) a single arbitrator shall be selected from a list of at least 7 individuals provided by the AAA; (iii) the party demanding arbitration shall make the first, third and fifth strikes from the list; (iv) the second party shall make the second, fourth and sixth strikes; and (v) the remaining individual from the original list of seven shall be the arbitrator. Regardless of whether the parties select the single arbitrator without the assistance of the AAA or whether the AAA conducts the arbitration, the following procedures shall apply:

    i. Either party (Company or Independent Grower) shall demand arbitration in writing within one hundred twenty (120) days after the alleged claim was known or reasonably should have been known by serving a copy of the written demand to the other party. If the Company demands arbitration, the written demand shall be provided to the Independent Grower. If the Independent Grower demands arbitration, the written demand shall be provided to the Company by mail to Pilgrim's Pride Corporation, Attn: Legal Dept., 1770 Promontory Circle, Greeley, CO 80634.

    ii. The parties hereby agree that the arbitrator selected shall be a neutral and impartial arbitrator.

    iii. The arbitrator shall be a person having knowledge of or experience with respect to the poultry production industry.

    iv. Each party shall bear its own arbitration costs and expenses, and the costs and expenses of the arbitrator shall be shared jointly and equally between the parties.

    v. The arbitration hearing shall be held within the specified venue or an agreed-to location. At least twenty (20) days advance notice of the hearing date, time and location shall be provided to both parties.

    vi. Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitrator upon a showing of substantial need by the party seeking discovery.

    vii. The arbitrator shall have no power to award non-monetary or equitable relief of any sort. The arbitrator shall also have no power to award (a) damages inconsistent with any applicable agreement between the Parties or (b) punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum.

    viii. The arbitrator shall hear the evidence and testimony offered by the parties, and the arbitration hearing shall be concluded within ten (10) days from its starting date unless otherwise ordered by the arbitrator. The arbitrator will make a decision within thirty (30) days from the completion of the hearing. Either party may ask for a reasoned award in writing, which shall be provided to the parties. Both parties shall be allowed a period of time to submit post-hearing briefs within a period of time designated by the arbitrator. Any award rendered by the arbitrator shall be final and binding on all parties except as provided by law. Such judgment or award rendered by the arbitrator may be recorded or entered by either party in any court having jurisdiction pursuant to this Agreement.

    ix. The parties stipulate that the provisions hereof shall be a complete defense to any suit, action, or proceeding instituted in any federal, state or local court or before any administrative tribunal. The arbitration provisions hereof shall, with respect to any controversy or dispute, survive the termination or expiration of this Agreement and/or its Exhibits.

    x. Nothing herein contained shall be deemed to give the arbitrator any authority, power, or right to alter, change, amend, modify, add to or subtract from any of the provisions of this Agreement and/or its Exhibits.

    xi. Failure by either party to participate in the arbitration process shall preclude that party from objecting to the arbitration proceedings.

    xii. <u>**INDEPENDENT GROWER MAY DECLINE TO BE BOUND BY ARBITRATION BY COMPLETING THE INFORMATION AND PLACING HIS OR HER SIGNATURES ON PAGE 5 OF THE AGREEMENT**</u>. If Independent Grower elects not to be bound by this Arbitration section, Independent Grower and the Company can nevertheless agree to arbitrate any and all claims between themselves arising out of or relating in any way to the execution, interpretation and performance of this Agreement and/or its Exhibits by consenting to arbitration in writing after the claim(s) arise.

8) Confidentiality. Independent Grower acknowledges that its employees and other representatives will be exposed to confidential and proprietary information of Company during the ordinary course of providing the services contemplated by this Agreement. Independent Grower agrees to use its best efforts and to cause its employees and other representatives to use the same degree of care to maintain the confidentiality of such information as it would and/or does with respect to its own proprietary and confidential business information. Independent Grower agrees to refrain from disclosing any part of Company's confidential and proprietary information to a third party. Independent Grower further agrees not to use any confidential and proprietary business information of Company for any purpose other than the performance of the Services described hereunder.

9) Business Ethics. Neither party will offer or provide to the employees, agents or other representatives of the other party any favors, gratuities, gifts, payments, or anything of value, whether or not in an attempt to influence such person's administration of the provisions of Agreement or to otherwise gain unfair advantage individually and/or relative to competing suppliers/vendors.
Additionally, each party will immediately report to the other party any requests made for favors, gratuities, gifts, payments, or anything of value by employees, agents or other representatives of such party and will cooperate with respect to any inquiry or investigation being conducted related to such activities or alleged activities. Pilgrim's Pride has established its Pride Line with the toll-free number of 1-888-536-1510 to report any unethical conduct.

10) Prior Agreements/Entire Agreement. This Agreement supersedes, voids and nullifies any and all previous Broiler Production Agreements and all other previous agreements governing the relationship between Independent Grower and Company. The Independent Grower and Company hereby release and extinguish all claims that they may have against each other under any previous Broiler Production Agreement and all other previous agreements governing the relationship between Independent Grower and Company. This Agreement, and any Exhibits hereto, constitute the entire agreement between the parties, and those documents supersede all oral statements and other communications made before the execution of those documents. Independent Grower acknowledges that in entering into this Agreement, he/she has not relied upon any statements that are not contained in this document, and/or the Exhibits hereto.

11) Verbal Abuse or Physical Threat. Verbal abuse and/or physical violence or threat of violence by the Independent Grower or his/her agents to employees, representatives, and/or agents of, and/or contractors hired by Company will not be tolerated. Any threatening physical action,

verbal threat, or abusive language by Independent Grower or parties under its control will result in immediate termination of this Agreement and its Exhibits. Any reference to or presentation of weapons or firearms will be considered a physical threat. Company employees, representatives, and/or agents of, and/or its contractors will be expected to follow like conduct in avoiding verbal abuse and/or physical violence or threat of violence.

12) **Unusual Circumstances.** In the event the parties hereto shall fail to perform their obligations hereunder, the same shall not constitute a breach of this Agreement and/or its Exhibits, when and while, and to the extent that such failure shall be caused by an act of God, fire, riot, work stoppage, war, or compliance with acts or requests of any governmental authority beyond reasonable control of such party.

13) **No Modification Except In Writing.** The parties agree that this Agreement and the Exhibits hereto may not be modified except in writing signed by both the Company and Independent Grower.

14) **Exclusion of Incidental, Consequential, and Certain Other Damages.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER THE COMPANY NOR INDEPENDENT GROWER SHALL BE LIABLE TO ONE ANOTHER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, NOMINAL, CONSEQUENTIAL, EXEMPLARY OR NON-COMPENSATORY DAMAGES WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT AND/OR ITS EXHIBITS, AND/OR THE PERFORMANCE OF THE PARTIES UNDER THIS AGREEMENT AND/OR ITS EXHIBITS.

15) **Opportunity to Consult Third-Parties.** Independent Grower acknowledges that he/she has had the opportunity to consult with third-parties including, but not necessarily limited to, legal and financial advisers, before entering into this Agreement and its Exhibits.

16) **Severability.** The parties agree that if any of the provisions of this Agreement and/or its Exhibits shall be held void for any reason, the remaining provisions shall continue in full force and effect.

17) **Choice of Law and Venue.** Independent Grower and the Company agree that disputes should be arbitrated as set forth above. The parties agree that the substantive laws of the State in which the farm is located shall govern the interpretation of this Agreement and/or the Exhibits hereto, and all other dealings between Independent Grower and Company, even if the choice of law rules of that State would otherwise allow for the application of the substantive laws of a different state. IF ANY MATTERS IN DISPUTE ARE REQUIRED TO BE SETTLED BY LITIGATION, SUCH TRIALS WILL BE DECIDED BY A JUDGE. THE PARTIES WAIVE TRIAL BY JURY IN ANY SUCH ACTION(S) AND CONFIRM THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THEIR BUSINESS TRANSACTIONS. ANY SUCH LITIGATION, ENFORCEMENT OF AN ARBITRATION RULING OR OTHER PROCEEDING BETWEEN THE PARTIES THAT MAY BE BROUGHT, OR ARISE OUT OF, IN CONNECTION WITH OR BY REASON OF THIS AGREEMENT SHALL BE BROUGHT IN THE FEDERAL DISTRICT COURT AND DIVISION IN AND FOR THE COUNTY IN WHICH THE FARM IS LOCATED AND SUCH COURT SHALL BE THE EXCLUSIVE COURT OF JURISDICTION AND VENUE.

Signed on the dates indicated below but effective as of the date first written above.

**INDEPENDENT GROWER**

Eric K. Hedrick
Independent Grower Signature

Triple R Ranch LLC
Independent Grower Name

HC 32, Box 63E
Upper Tract, WV. 26866
Address, City, State, Zip Code

SSN: [redacted]

Phone No. 304-358-3197

Date: 3-12-12

**PILGRIM'S PRIDE CORPORATION**

By: Michael S. Ellington

Name: Michael S. Ellington

Title: Operations Manager

Date: 3/16/12

---

*Right to Decline Arbitration. A poultry grower, livestock producer or swine production contract grower has the right to decline to be bound by the arbitration provisions set forth in this Agreement. A poultry grower, livestock producer or swine production contract grower shall indicate whether or not it desires to be bound by the arbitration provisions by signing one of the following statements; failure to choose an option will be treated as if the poultry grower, livestock producer or swine production contract grower declined to be bound by the arbitration provisions set forth in this Agreement:*

*I decline to be bound by the arbitration provisions set forth in this Agreement:*     Eric K. Hedrick

*I accept the arbitration provisions as set forth in this Agreement:*     _____

# EXHIBIT A
## BROILER PRODUCTION PAYMENT SCHEDULE
### Broadway, VA / Moorefield, WV Complex
### Moorefield Processed
### Retrofit Tunnel Fog

The Independent Grower shall be paid by the Company for Marketable Broiler Live Weight pounds according to the formula described below. "Marketable Broiler Live Weight" is defined as gross live weight at the processing plant or other recognized scale at the Company's option. A "flock" is defined as birds from all houses under an individual Broiler Production Agreement.

The following procedure will determine the payment to the Independent Grower in consideration for raising the Broilers:

1) Each week an average production cost, exclusive of Grower Payment, will be calculated for all pounds marketed during the calendar week in the complex. This cost will be designated as "Weighted Average Formula Cost."

    The Weighted Average Formula Cost shall be the sum of:
    a) Total chicks placed for the complex times 20 cents per chick, plus
    b) Total pounds of feed used at the complex times 10 cents per pound of feed, plus
    c) Water medication used at the complex at the Company's cost,
    with the total of a, b, and c divided by the complex's gross live pounds of Broilers for the week.

    To prevent irregular spreads in the weekly Weighted Average Formula Cost, any broiler flock whose Grower Formula Cost is ten (10) percent more than, or less than the Weighted Average Formula cost for the week will be removed from the computation of the weekly Weighted Average Formula Cost. Independent Growers that are company employees (or immediate family members of an employee) or broiler service contractors will be excluded from the calculations used to determine the Weekly Average Formula Cost.

2) The individual Independent Grower's production cost per pound, exclusive of Grower Payment, will be calculated on a formula cost basis for each flock produced under the Broiler Production Agreement. This cost will be designated as "Grower Formula Cost."

    The individual Grower Formula Cost shall be the sum of:
    a) Total chicks placed with the Independent Grower times 20 cents per chick, plus
    b) Total pounds of feed delivered to the Independent Grower less feed picked up with that difference multiplied by 10 cents per pound of feed, plus
    c) Water medication used by the Independent Grower at the Company's cost,
    with the total of a, b, and c divided by the Independent Grower's gross live pounds of Broilers for the flock.

3) The Grower Payment per Marketable Broiler Live Weight pound for a flock with a "Grower Formula Cost" LESS than the "Weighted Average Formula Cost" in a week will be: 5.55 cents (base payment) PLUS the amount of the difference between the "Grower Formula Cost" and the "Weighted Average Formula Cost" for the week.

4) The Grower Payment per Marketable Broiler Live Weight pound for a flock with a "Grower Formula Cost" MORE than the "Weighted Average Formula Cost" in a week will be: 5.55 cents (base payment) MINUS the amount of the difference between the "Grower Formula Cost" and the "Weighted Average Formula Cost" for the week.

5) Under no circumstances will the Grower Payment be less than 4.05 cents per pound Marketable Broiler Live Weight pounds produced.

6) Any attempt by the Independent Grower to manipulate this formula by using feed, chicks, or medication not furnished by the Company for a particular flock will be grounds for immediate termination of the Broiler Production Agreement and its Exhibits.

7) An energy allowance shall be paid in addition to the above Grower Payment on all flocks placed, provided that good management practices are followed as determined by the Company's field service technician. These good management practices include, but are not limited to, proper house preparation, proper brooding, and ventilation. The energy allowance payment will be 0.20 cents (two-tenths of a cent) per Marketable Broiler Live Weight pound.

8) A tunnel fog house is a broiler house that meets all Company broiler house requirements and meets the tunnel ventilation specifications but lacks an approved evaporative cooling pad system. Broilers grown in the Grower's existing houses and in all other houses that do not meet all of the criteria outlined by the Company shall be subject solely to payment according to the standard Exhibit A Payment Schedule to the Broiler Production Agreement versus the New House/Retrofit Tunnel Fog House Payment Schedule, and will be considered a separate flock from those grown in the new or retrofit tunnel fog houses meeting all the Company requirements.

**Examples of Grower Payment:**

Example 1)
| | |
|---|---|
| Weekly Weighted Average Formula Cost | 22.00 cents |
| Grower Formula Cost | 21.80 cents |
| Difference | .20 cents (to be added to base payment) |
| Base Payment | 5.55 cents |
| Total Grower Payment Per Marketable Broiler Live Weight Pound | 5.75 cents |
| Energy Allowance Year Round Weighted Average | .20 cents |
| Total Payment Per Marketable Broiler Live Weight Pound | 5.95 cents |

Example 2)
| | |
|---|---|
| Weekly Weighted Average Formula Cost | 22.00 cents |
| Grower Formula Cost | 22.25 cents |
| Difference | .25 cents (to be subtracted from base payment) |
| Base Payment | 5.55 cents |
| Total Grower Payment Per Marketable Broiler Live Weight Pound | 5.30 cents |
| Energy Allowance Year Round Weighted Average | .20 cents |
| Total Payment Per Marketable Broiler Live Weight Pound | 5.50 cents |

Settlement checks will be mailed within ten (10) working days after the week-end following final delivery of birds from all Growers which are involved in settlements during said week. A Grower whose broilers are picked up in more than one calendar week will be grouped in the week the last broilers are removed from the farm.

INDEPENDENT GROWER

_Eric K. Hedrick_
Independent Grower Signature

_Triple R Ranch LLC_
Independent Grower Name

_HC 32, Box 63 E_
_Upper Tract WV, 26866_
Address, City, State, Zip Code

SSN

_304-358-3197_
Phone No.

Date: _3-12-12_

PILGRIM'S PRIDE CORPORATION

By: _Mill S G_

Name: Michael S. Ellington

Title: Operations Manager

Date: _3/16/12_

**EXHIBIT B**
**PILGRIM'S PRIDE CORPORATION**
**COST IMPROVEMENT PROGRAM**

Pilgrim's Pride Corporation has a Cost Improvement Program (the "Program") designed to help improve the performance of its high cost Independent Growers as set out below. The purpose of this program is to assist these Independent Growers in becoming more competitive and cost efficient. Participation in this Program is determined by the Independent Grower's pay and the deviation from the average standard cost as established by the provisions of the Broiler Production Agreement.

An Independent Grower will enter the Program when his or her average pay per pound is $.0050 or more under the average base payment for the contract over a successive period of 6 flocks. When this occurs, the Broiler Production Manager, Service Technician, and Independent Grower will meet to discuss ideas to improve his or her performance and ways to achieve more cost effective production. The items to be reviewed may include, but will not be limited to, items such as:

   a.   Poultry House Management-Discussion of day-to-day management of the broilers.
   b.   Bird Density-Discussion of density options, with every effort made to reach a mutual agreement on any density change.
   c.   Equipment and Housing Issues-Discussion of current issues other than replacement of existing equipment.
   d.   Specific Disease Issues.

Except as set out in this Exhibit B, all other terms and conditions of the Broiler Production Agreement remain in full force and effect. During any probationary period of the Cost Improvement Program either the Company or the Independent Grower may elect at any time to exercise its rights to terminate the Broiler Production Agreement as noted in Section D of the Agreement.

While in the Program the Independent Grower will be placed on a probationary status for no less than three (3) flocks and must increase his or her average pay within $.0050 of the base payment for these three (3) successive flocks to be taken off of probationary status and released from this Program. If the Independent Grower's average pay does not improve to a level within $.0050 of the base payment for the first three (3) successive flocks after entering the Program, then the Independent Grower's Broiler Production Agreement will be modified by removing the minimum pay per pound for the next three (3) successive flocks and the Independent Grower will remain on probation and in the Program. If, during this extended probation of three (3) successive flocks the Independent Grower improves its performance sufficient to increase his or her average pay within $.0050 of the base payment for these three (3) successive flocks, then the Independent Grower will be taken off of probationary status and released from the Program. If, however, during this extended probation of three (3) successive flocks, the Independent Grower again fails to improve its performance sufficient to increase his or her average pay to a level within $.0050 of the base payment for these three (3) successive flocks, then the Company may terminate the Independent Grower's Broiler Production Agreement.

At the Company's sole discretion, based on mitigating circumstances, the Company may extend this Program on a flock to flock basis with the understanding that the minimum pay per pound will remain removed from the Independent Grower's Broiler Production Agreement. If the Independent Grower does not improve its performance to increase his or her average pay within $.0050 of the base payment for such flock, the Company may terminate the Independent Grower's Broiler Production Agreement or at its sole discretion extend the Program for another flock.

Performance factors caused by natural disasters or other conditions beyond the reasonable control of the Independent Grower may be considered exceptions to this Program at the sole discretion of the Company.

The Independent Grower and the Company both acknowledge that the Cost Improvement Program is related to the Independent Grower's best efforts under the applicable Broiler Production Agreement. Therefore, if the Independent Grower is in a Cost Improvement Program at the time he or she enters into a new Broiler Production Agreement with its Exhibits, the Independent Grower's performance under the Cost Improvement Program before entering into the new Production Agreement will be considered in evaluating the Independent Grower's performance in the Cost Improvement Program after signing the new Broiler Production Agreement.

**EXHIBIT C**
**DEAD BIRD AND POULTRY HOUSE LITTER**
**BEST MANAGEMENT PRACTICES**

## DEAD BIRD BEST MANAGEMENT PRACTICES

1. All dead birds will be disposed of by one or more of the following approved methods:
   a. Composting
   b. Incineration
   c. Rendering
   d. Any other method approved by the applicable state regulatory agency

2. In the case of a major die-off that cannot be disposed of by the normal, approved means on that farm, the Independent Grower will contact a Pilgrim's Pride Corporation representative within 24 hours to report the loss. Pilgrim's Pride Corporation will call the appropriate state agency to obtain a permit for burial.

## POULTRY HOUSE LITTER BEST MANAGEMENT PRACTICES

Where poultry house litter is land applied on property owned or leased by the Independent Grower, the following Best Management Practices, in conjunction with all applicable state regulations pertaining to litter disposal, shall be followed:

1. Poultry litter should not be stored outside unless covered and proper controls, such as berms or dikes, are utilized to prevent rainfall runoff from coming in contact with the litter.
2. Poultry litter should be evenly distributed over application sites at a rate not to exceed 5 tons per acre per year, or as otherwise directed in a site specific land management plan.
3. Land application of poultry litter should not be undertaken when soil is saturated, frozen, or covered with snow.
4. Poultry litter should not be applied on slopes with a grade of more than 15 percent.
5. Edge of field grassed strips should be used to separate watercourses from land application areas. Land subject to excessive erosion should be avoided when applying litter.
6. Records should be kept by the Independent Grower of the dates, quantity, and specific sites where litter is applied.
7. Vehicles used for transporting poultry litter on state or federally maintained roads or more than 1 mile on any other public road should be covered or tarped.

Where poultry house litter is sold or given to another party for land application or other approved use, the following Best Management Practices, plus any other state requirements, will be followed by the Independent Grower:

1. Records should be kept by the Independent Grower of the dates, quantity, and individual or company receiving the litter.
2. A copy of the above Best Management Practices to be utilized in the land application of the litter should be provided to the individual or company receiving the litter.



## AMENDMENT TO BROILER PRODUCTION AGREEMENT
## EXHIBIT A – PAYMENT SCHEDULE
Broadway, VA / Moorefield, WV Complex
Moorefield Processed
Retrofit Tunnel Fog

This Amendment to Exhibit A Payment Schedule ("Amendment") amends and modifies the Pilgrim's Broiler Production Agreement between _____Triple R. Ranch_____ (Grower/Farm Name) (hereinafter referred to as "Independent Grower") and Pilgrim's Pride Corporation (hereinafter referred to as "Pilgrim's" or "Company"). Company and the Independent Grower agree to amend the Broiler Production Agreement as follows:

A. In Paragraph 3 on Exhibit A, the base payment shall be changed from 5.55 cents to **5.85 cents**.

B. In Paragraph 4 on Exhibit A, the base payment shall be changed from 5.55 cents to **5.85 cents**.

C. In Paragraph 5 on Exhibit A, the minimum pay per pound shall be changed from 4.05 cents to **4.35 cents**.

D. The Example of Grower Payment shall be deleted in its entirety and replaced with the following:

**Example of Grower Payment:**

Example 1)
| | |
|---|---|
| Weekly Weighted Average Formula Cost | 22.00 cents |
| Grower Formula Cost | 21.80 cents |
| Difference | .20 cents (to be added to base payment) |
| Base Payment | 5.85 cents |
| Total Grower Payment Per Marketable Broiler Live Weight Pound | 6.05 cents |
| Energy Allowance Year Round Weighted Average | .20 cents |
| Total Payment Per Marketable Broiler Live Weight Pound | 6.25 cents |

Example 2)
| | |
|---|---|
| Weekly Weighted Average Formula Cost | 22.00 cents |
| Grower Formula Cost | 22.25 cents |
| Difference | .25 cents (to be subtracted from base payment) |
| Base Payment | 5.85 cents |
| Total Grower Payment Per Marketable Broiler Live Weight Pound | 5.60 cents |
| Energy Allowance Year Round Weighted Average | .20 cents |
| Total Payment Per Marketable Broiler Live Weight Pound | 5.80 cents |

Except for the above-referenced modifications per this Amendment to Exhibit A – Payment Schedule, all other terms and conditions of the applicable Pilgrim's Broiler Production Agreement remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Amendment to Exhibit A of the applicable Pilgrim's Broiler Production Agreement effective on the __1__ day of __Sept__, 20__14__.

**PILGRIM'S PRIDE CORPORATION:**

By: _Daniel Eye_
Name: _Daniel Eye_
Title: _Service Tech_

**INDEPENDENT GROWER**

By: _Eric K. Hedrick_
Printed Name: _Eric Hedrick_
Farm Name: _Triple R. Ranch_
Address: _5353 South Mill Creek Rd_
_Upper Tract WV 26866_
Taxpayer I.D. No.: ███████
Phone #: _304-358-3197_